# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

KATHARINE MORRISON,

    Defendant.

0090 1:21CR00334-003

SENTENCING STATEMENT

    JEFFREY L. CICCONE, Assistant Federal Public Defender, attorney for Katharine Morrison, respectfully submits this sentencing statement in connection with the above-captioned matter.

    The factual representations made in this Statement are based on investigations by members of my office, conversations with Ms. Morrison, a review of the Presentence Investigation Report (hereinafter PSR) and the following exhibits:

| | |
|---|---|
| Exhibit A: | Katharine Morrison Wheatland-Chili Middle School Scholastic and Attendance Record for School Years 1997-1998 and 1998-1999; |
| Exhibit B: | Smith Road Community Residence Release/Termination Summary; |
| Exhibit C: | Correspondence from Kimberly Hoover, Physician Assistant, Oak Orchard Health, Hornell, New York, dated February 14, 2023; |
| Exhibit D: | RKKS Mental Health Evaluation and Treatment Plan, dated May 23, 2022; |
| Exhibit E: | Letter of Support written by Bryan Acomb, dated March 27, 2023; |
| Exhibit F: | Letter of Acceptance written by Katharine Morrison, dated January 9, 2023; |
| Exhibit G: | Letter of Support written by Suzanne Stokoe, dated January 2023; |

| | |
|---|---|
| Exhibit H: | Letter of Support written by Kylie DeBerardinis, dated January 6, 2023; |
| Exhibit I: | Letter of Support written by Julie Izzo Niedzwick, dated January 3, 2023; and |
| Exhibit J: | Letter of Support written by Kyla J. McCormick, dated January 2, 2023. |

## BACKGROUND

On October 3, 2022, Ms. Morrison pled guilty to Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §1512(c)(2) and 2.

Although the PSR provides the Court with some information regarding Ms. Morrison's background, this sentencing statement highlights additional information regarding her history and characteristics that may be relevant to the Court's sentencing decision. Sentencing is currently scheduled for May 11, 2023.

## GENERAL SENTENCING AUTHORITY

Under 18 U.S.C. §3553(a), federal sentencing courts must impose a sentence that is *sufficient, but not greater than necessary*, to meet the purposes of sentencing. This includes the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid sentencing disparities between defendants with comparable criminal records who have been convicted of similar crimes, and the Guidelines themselves. *See* 18 U.S.C. §3553(a)(1)-(6).

The importance of individualized sentencing is a central theme in federal criminal law. It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, and sometimes magnify, the crime and the punishment to ensue. *Koon v. United States*, 518 U.S. 81, 113 (1996).

In *Booker*, the United States Supreme Court emphasized the importance of reserving discretion to federal sentencing judges. The Court held that:

> The federal sentencing statute … requires a sentencing court to consider Guidelines ranges…, but it permits the court to tailor the sentence in light of other statutory concerns as well.

543 U.S. at 245-246.

The Court thereafter reaffirmed its position in *Kimbrough v. United States*, 552 U.S. 85 (2007) stating that

> The sentencing judge … has greater familiarity with ... the individual case and the individual defendant before him than the Commission or the appeals court. He is therefore in a superior position to find facts and judge their import under [§3553(a)] in each particular case.

*Id.* at 108 (internal quotations omitted).

## THE NATURE OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

### *Katharine Morrison's Background*

Katharine Morrison (hereinafter Kate) is a 38-year-old mother of two. Her son, Hotchner is five years old. Her daughter, Harper is three. Kate lives with her children and the father of her children, Bryan Acomb in Dansville, New York. Dansville is a village in the southern tier of New York State, halfway between the cities of Rochester and Corning.

Kate was one of three children born to Wayne and Linda Morrison. Wayne was a self-employed roofer and Linda was initially a stay-at-home mother. During Kate's middle school and high school years, Linda returned to work as a teacher.

Recalling her childhood, Kate's most prominent memories are of watching her parents'

marriage fall apart. When she was ten years old, Kate saw her mother with another man. Her father was in Africa at the time. Shocked and confused, Kate did not know what to do. For two years, she did nothing. The secret, however, tore her apart. Eventually, Kate revealed to her mother what she had seen.

Kate's twelfth birthday ushered in a tumultuous divorce and custody battle. She specifically recalls her mother lying to the family court judge, claiming that her father was a violent, unfit parent who had repeatedly hit his children. Kate does not remember her father ever hitting her. Nonetheless, Kate's mother was awarded full custody of the three children. They moved from their spacious family home in Scottsville, New York to a small, two-bedroom apartment. For a time, Kate slept in a sleeping bag on the basement floor because there were not enough beds for everyone.

The trauma of the divorce and custody battle caused Kate to develop severe depression and suicidal ideations. Her mother's response was to punish Kate for "always being sad." As the depression worsened, Kate refused to go to school. In the seventh grade, Kate earned an 81 grade-point average and was absent from school ten times. A year later, her grade point average dropped to 51, with 45 reported absences. *See* Exhibit A, Katharine Morrison Wheatland-Chili Middle School Scholastic and Attendance Record Grades for School Years 1997-1998 and 1998-1999.

The exceedingly high number of absences caused the school district to file a PINS (Person In Need of Supervision) petition with the Monroe County Family Court. As defined in the NYCOURTS.GOV website, a PINS petition can be filed when:

> A child under the age of 18 who does not attend school or behaves in a way that is dangerous or out of control, or often disobeys his or her parents, guardians or other authorities, may be found to be a Person in Need of Supervision or "PINS." All PINS proceedings are heard in Family Court. There is a possibility that the PINS proceeding could be settled outside of court through the Family Assessment Program (F.A.P.) that is

4

>     run by the Administration for Children's Services (ACS) and the NYC
>     Department of Probation.

*See,* https://ww2.nycourts.gov/COURTS/nyc/family/faqs_pins.shtml.

Following the PINS petition, Kate was placed in the Smith Road Community Residence in Webster, New York.  Smith Road is a facility that provides a supervised, therapeutic environment for children ages 5 to 18 years of age.  *See*, https://www.nyconnects.ny.gov/services/smith-road-community-residence-omh-pr-901400015672.  Kate's mother warned that if she did not go to the group home, she would be sent "somewhere with bars."

 Kate resided at Smith Road from July 1999 to September 1999.  The PINS petition was removed in August 1999.  *See* Exhibit B, Community Residence Release/Termination Summary.  Kate's time at Smith Road only added to her depression.  She was a 15-year-old girl from Scottsville, New York, a rural village outside of Rochester, who was suffering from severe depression.  Kate was not a delinquent.  She never got in trouble outside of her home or at school.  The staff at Smith Road warned Kate to stay away from certain residents, one who had threatened to take a female resident hostage by holding broken glass up to her neck, and two other residents who had been suspected of attempted murder in the course of selling drugs.  Kate secluded herself in her room as much as possible.

When Kate left Smith Road, she moved in with a friend's family for several months.  She transferred from the Wheatland-Chili School District to Westside Academy, an alternative high school designed to meet the need of students who have experienced academic, behavioral or emotional difficulties.  Unfortunately, things did not get any easier.  Kate had met a young 21-year-old man online who she seemed to have a lot in common with.  Over the holidays in the year 2000, this young man invited Kate to his house.  He picked Kate up, took her to his house and proceeded to rape her.  Kate felt ashamed and blamed herself.  She did not tell anyone what had

happened. Instead, she wrote about it in her diary.

Kate left school after the 11th grade and went to live with her father. She was happy with her father. He had always been her best friend. She remembers taking long Sunday drives with him while listening to Bonnie Raitt and Paul Simon. Kate and her father always shared a love for animals. When Kate was eight years old, her father bought her a Holstein heifer, a traditional black and white dairy cow. Kate named her Betty. After the divorce, to Kate's dismay, her mother sold Betty.

In her early 20s, hoping to put her past behind her, Kate sought employment in the veterinary field. In 2006, she was hired by Monroe Veterinary Associates in Rochester as a veterinary assistant, a job she held for over ten years. In 2015, Kate decided to start her own small farm. She began with rabbits, chickens and ducks. In January 2016, Kate responded to an ad selling feeder piglets. Feeder piglets are young pigs raised exclusively for their meat.

The farmer selling the piglets was Bryan Acomb. As Kate describes it, something "just clicked" between herself and Bryan. Within several months, Kate moved to Dansville to live with Bryan. Their first son, Hotchner was born on June 6, 2017. Two years later, Kate and Bryan welcomed their daughter, Harper.

### *Acomb Acres*

Kate and Bryan are hard-working farmers. Bryan's family owns Acomb Acres, which was established in 1954 and has been family-owned and operated for three generations. The farm consists of 1200 acres and three barns. *See,* https://www.facebook.com/AcombAcres/posts/sometimes-the-best-view-on-the-farm-is-from-the-window-looking-in/2524680834436805/.

The animals on the farm include cattle, sheep, ewes, goats, pigs, chickens and turkeys. The chores associated with these animals include feeding, breeding, butchering, and veterinary

appointments. Bryan works seven days a week, year-round. He arrives at the farm early every morning to feed the animals. Each species of animal has different nutritional requirements. For example, laying hens receive a different feed than meat chickens. Bryan grinds and mixes custom rations for each species of animal, by manually adding ingredients to the feed grinder. Once the feed is ground, feeding tubs are filled for each type of animal.

Bryan also maintains and cleans three large barns. Large bales of straw must be moved and spread into the animal pens. Bryan additionally services all of the farm equipment, both large and small.

Apart from the animals, Bryan also maintains 1200 acres of commodity crops, including corn, oats and custom hay. The springtime is spent planting the fields. In the autumn, those crops must be harvested. During those busy times of the year, Bryan works up to 16 hours every single day.

Kate is at the farm each morning between 5:00 a.m. and 5:30 a.m. to milk their cow ZuZu. She returns to the farm each evening to do the same. ZuZu produces up to four gallons of milk per day, which Kate uses to make fresh cream, butter and cheeses, such as ricotta and mozzarella.

### *Kate's Physical Health*

When Kate was in her 20s, she was treated by a neurologist for several years for nerve pain. The fear was that she might have multiple sclerosis. But, the pain mysteriously disappeared. Aside from that, and laparoscopic surgery in 2011 to remove an ovary, Kate has been in fairly good health -- until recently. In the early morning of December 23, 2022, Kate was awoken by a severe pain in her neck. The pain was so extreme, she went to the Emergency Department at Noyes Hospital in Dansville, NY. Her initial diagnosis was a bulging disc. A Cat Scan, MRI and a nerve conduction study was ordered. Kate required strict bed rest and pain medication.

The MRI confirmed a herniated disc at C6-C7. *See* Exhibit C, Correspondence from

Kimberly Hoover, Physician Assistant, Oak Orchard Health, Hornell, New York, dated February 14, 2023.  The C6-C7 disc is the 6th cervical disc near the lower part of the neck and top of the shoulders.  The Duek Spine Institute describes a C6-C7 herniated disc as follows:

> The nerve root that would be affected by the C6-C7 disc herniation controls the arms, the shoulders, the heart, the lungs, and more. When a C6-C7 herniated disc occurs and the C6-C7 nerve root is irritated, the symptoms usually include neck pain and pain in the arms, weakness in the hands and weakness in the arms, shoulder pain, chest pain, uncontrollable sweating, headaches, and possibly more.
>
> As with any other herniated disc, a C6-C7 herniation is very painful and uncomfortable. The pain, tingling, numbness and weakness in the shoulders, arms and even hands and fingers could all point to this condition.

*See*, https://deukspine.com/conditions-we-treat/herniated-disc/c6-c7-disc-herniation/

According to Kate's neurosurgeon, Dr. Andrew Wensel, Kate will need to have the C4-C5 vertebrae in her neck removed and replaced with metal cages, which will be filled with bone marrow.  While Dr. Wensel believes Kate will have good range of motion following her surgery, the surgery will eventually compromise the vertebrae above and below C4 and C5.  A second surgery will be needed to address that compromise.  The initial surgery was scheduled for March 17, 2023, but, was adjourned due to sentencing in this matter.[1]  At this time, the pain in Kate's neck has worsened and she is now experiencing pain going down her right arm.

### *Kate's Arrest and Pretrial Adjustment*

On February 10, 2022, after Bryan left to drive Hotch to school, multiple armed law enforcement agents descended upon Kate's home.  Two-year-old Harper was still sleeping.  When Kate looked out of the window, she saw a federal agent aiming a rifle at her.  Kate walked outside and was immediately handcuffed and brought back into her house.

A female agent stayed with Harper in her bedroom, while other officers searched the house, two outdoor sheds, the garage and a freezer.  When Bryan returned home, he saw Kate

---

[1] Medical records have been requested from Dr. Andrew Wensel but have not been received as of the filing of this Sentencing Statement.  If received prior to sentencing, they will be sent to the Court under separate cover.

being placed inside a federal agent's car and taken away.  Kate appeared before United States Magistrate Judge Mark W. Pedersen for an Initial Appearance.  The Government did not move for detention and Kate was released on personal recognizance with several conditions.  For almost a year-and-a-half, Kate has abided by all conditions of her release.

On March 28, 2022, Kate was evaluated at RKKS Mental Health Counseling in Rochester, New York.  Since that date, Kate has met weekly with mental health counselor Kacie Switzer.  *See* Exhibit D, RKKS Mental Health Evaluation and Treatment Plan, dated May 23, 2022.  Kate has submitted monthly on-line reports to the United States Probation Office since February 2022.  Kate's supervising probation officer visited her home once, at the beginning of her pretrial release.  There has been no need for a second visit.

Kate has been a model pretrial defendant.  Along with following all of the requirements of the Court, Kate does not abuse alcohol, nor does she use any illegal drugs.  Kate has no prior criminal history.

*Kate is Needed by her Family*



Bryan, Kate and Harper Celebrating Harper's Birthday

Harper holding a chicken





Hotchner in the barn with the pigs

Kate and Bryan live a simple life.  They work hard to provide for their children.  The Presentence Report indicates that Kate is unemployed. *See* PSR ¶63.  Technically, that may be true, but that description falls far short of capturing Kate's true contribution to the family.  As a mother of two children under five, Kate is the primary caretaker because Bryan must work on the farm during most waking hours.  Kate usually takes Hotchner to school in the morning, after milking ZuZu and making breakfast for the family.  Harper, who is not yet in school, spends her days doing wherever her mother is doing.  Kate does whichever chores are needed on the farm, and then goes home to do household chores.  After ZuZu's evening milking, Kate returns home to prepare dinner.  If Bryan is working late at the farm, Kate bathes the children and reads them a story before putting them to bed.

During the day, Kate and Harper prepare lunches for the men working at the farm.  This typically includes Bryan, his father and two uncles.  Kate also makes butter once a week, and sometimes cheese.  Occasionally, she devotes a day to restocking their lard and tallow, which she renders from fat from the beef cattle or hogs.  Kate does the grocery shopping for the family once a week.  If fresh produce is in season, she barters or purchases fruit and vegetables from local farmers.  In the summer, Kate devotes time to canning tomatoes, fruits, jams, fruit butters, pickles and vegetables.

Kate also arranges play dates for Hotch and Harper with nearby farmers who have children similar in age.  While the kids play, Kate and the other farmers help each other with various farm tasks.  Now that Hotchner is in school, Kate also attends school functions and parent teacher-meetings.

Farming is not a particularly lucrative profession.  As noted in the PSR, Bryan's take-home pay amounts to approximately $1300 a month.  Kate and Bryan's monthly finances are usually in the red.  *See* PSR, ¶67.  To help the family financially, Kate somehow finds the time to work at

Stokoe Christmas Tree Farm in Scottsville, New York.  She works 40 hours per week from March until May, and again from mid-September to the third week of December.

Given all that she contributes to her home, husband, children, and farm, Kate is indispensable to her family.  Should she be incarcerated, Bryan does not know what he would do.  *See* Exhibit E, Bryan's letter to the Court.  He cannot both care for the children and take care of the farm.  He also cannot afford to put the children in daycare.

### *Kate is a Zero-Point Offender*

As referenced above, this is the first time Kate has been arrested for any crime.  Under the Sentencing Guidelines, Kate has zero criminal history points and thus falls within Criminal History Category I.  *See* PSR ¶40.  The advisory Sentencing Guidelines range contemplated by the parties in the written plea agreement includes a recommended term of 15 to 21 months.  *See* Docket #72 at 4.

Subsequent to Kate's plea, the United States Sentencing Commission voted to adopt several proposed amendments to the Federal Sentencing Guidelines.  Unless Congress enacts law to modify or disapprove any such amendments, they will go into effect on November 1, 2023.  *See* United States Sentencing Commission, Amendments to the Sentencing Guidelines (Preliminary), dated April 5, 2023, *available at* https://www.ussc.gov/guidelines/amendments/adopted-amendments-effective-november-1-2023.  One of the amendments affects defendants who, like Kate, have zero criminal history points.  *See id*. at p71.

According to the Commission, recidivism data demonstrates that offenders with zero criminal history points have "considerably lower recidivism rates than other offenders, including lower recidivism rates than the offenders in Criminal History Category I with one criminal history point."  *See id*. at p71-72 (citing US SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), *available at* https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010.

13

Once amended, Section 4C1.1 of the Sentencing Guidelines will provide for a 2-level reduction for "zero-point" offenders if they satisfy the following criteria:

> (1) The defendant did not receive any criminal history points under Chapter 4, Part A;
> (2) The defendant did not receive an adjustment under §3A1.4 (Terrorism);
> (3) The defendant did not use violence or credible threats of violence in connection with the offense;
> (4) The offense did not result in death or serious bodily injury;
> (5) The instant offense of conviction is not a sex offense;
> (6) The defendant did not personally cause substantial financial hardship;
> (7) The defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
> (8) The instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);
> (9) The defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (serious Human Rights Offense); and
> (10) The defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. §848.

*Id.* at 72.

To be clear, Kate is not asking the Court to apply the two-level reduction that will be available to other zero-point defendants once the Guidelines Amendments become effective. The written plea agreement specifically prohibits the defense from advocating for a Guideline range other than that contemplated by the agreement. Nevertheless, the upcoming amendment is relevant to the Court's determination as to whether a sentence outside the anticipated Guidelines range is appropriate for Kate. If the amendment had been applicable at the time of Kate's plea, the advisory Guidelines range would have been 10 to 16 months and would have fallen within Zone C of the Sentencing Table. Accordingly, a non-custodial sentence would be more than sufficient to satisfy the sentencing requirements of §3553.

### *Kate Has Taken Responsibility and Expressed Remorse for Her Actions*

Kate's letter to the Court is sincere and remorseful. *See* Exhibit F, Letter of Acceptance written to the Court. Kate is ashamed of her actions. She writes, "I wish I had just stayed home.

14

With every ounce of my body, I regret going to the capital that day." That day, January 6, 2021, started out as a once in a lifetime opportunity for Kate. She had never been to Washington D.C., nor had she ever witnessed a president speak in person.

Today, as she says in her acceptance letter, Kate "cannot fathom how [she] had become a part of something so terrible." Kate now realizes, as she writes, "if I had not walked into [the Capitol], maybe someone else with bad intentions wouldn't have felt emboldened enough to walk behind me, and for that I can't tell you how sorry I am." *Id*.

Kate is a much better person than the mistakes she made on January 6, 2021. She is not an angry protester. She is not a member of the Oath Keepers, the Proud Boys, or any other extremist group. Kate is not a violent person, nor has she ever promoted violence. When Kate was arrested on February 10, 2022, more than thirteen months had passed since her visit to Washington, D.C. During those intervening months, Kate did not participant in marches, protests, or any kind of extremist behavior. Her behavior on January 6, 2021, was extremely aberrant and atypical from who Kate is.

Kate made a horrible mistake on January 6, 2021. A mistake that was totally inconsistent with her otherwise law-abiding life as a wife, mother and farmer. Nevertheless, for the rest of her life, Kate will be a convicted felon. Kate acknowledges that she must be punished. However, she respectfully asks the Court to not punish Bryan or her two young children. Incarcerating Kate will do just that. The Court can be sure that Kate will never make the same mistake again. She closes her letter to the Court by writing:

> I've learned since that day that the best thing I can do is stay at home. I can be the positive influence in my community and hopefully inspire others to do the same. I can raise my children to be self-sufficient, empathetic, compassionate and care for others. I can teach them to be open minded and befriend others regardless of what that person looks like or what their beliefs are.

We're raising our children on our family farm so you can imagine they're no stranger to hard work. I want them to see Bryan and I working hard, having little but still giving to others. I want them to always choose to do the right thing. I want them to be able to recognize when someone is in need and help them without a second thought.

We spend our days cooking together in the kitchen, caring for our animals, helping each other around the farm, sitting down at the table every night for family dinner and talking about our day.

We frequent our local library, small town events, baseball games, and try to support our local businesses when we are able to.

My children have never been without me. Our family isn't able to help us much with childcare - We do everything as a family, together.

This past season when I worked for the first time off the farm in 6 years, it took a toll on Bryan, but we needed the extra money. It helped buy the kids "new" (second hand) clothes, groceries and pay for their Christmas gifts. It was a lot mentally and emotionally for him to work 7 days a week and have the kids up to 6 of those days too while I worked.

I am pleading with you to please consider a sentence of home detention, probation, and community service.

I know I need to be punished but please don't punish my children and Bryan as well. Bryan has so much on his plate.  Punishment would not just affect me- it would affect our entire family and they did nothing wrong. Please show mercy on us.

*Letters Written to the Court on Kate's Behalf*

Several of Kate's closest friends have written letters to the Court on her behalf.

Please see:

Exhibit G: Letter written by Suzanne Stokoe, dated January 2023;

Exhibit H: Letter written by Kylie DeBerardinis, dated January 6, 2023;

Exhibit I: Letter written by Julie Izzo Niedzwick, dated January 3, 2023; and

Exhibit J: Letter written by Kyle J. McCormick, dated January 2, 2023.

Kate's actions on January 6, 2021, were a clear departure from the way that this 38-years-old mother of two has lived her otherwise law-abiding life.  After overcoming the difficulties that she

16

sustained following her parents' separation and divorce, Kate began work as a veterinary assistant. After nine years of working as a veterinary assistant she developed an interest in starting a small farm. She met Bryan Acomb when she answered an ad selling feeder piglets. A relationship soon developed between the two and, over the next few years, they welcomed two children into their lives. Along with being the childrens' primary caretaker, Kate's time is devoted to working the farm, as well as doing seasonal work to support the family. The Court should take this into consideration.

## CONCLUSION

For all of the above reasons, Katharine Morrison respectfully requests that this Court consider her history and characteristics, including her lack of criminal history, her remorse and acceptance of responsibility and the fact that she is needed by her family and impose a sentence of probation. If the Court does not believe a sentence of probation is appropriate, the defense respectfully asks that it consider a sentence of home incarceration.

Date:   May 4, 2023

To:   Anthony L. Franks, AUSA
      Aidee V. Gavito, USPO

/s/Jeffrey L. Ciccone
Assistant Federal Public Defender
Federal Public Defender's Office
28 East Main Street, Suite 400
Rochester, New York 14614
(585)262-6201
Jeffrey_Ciccone@fd.org
Attorney for Katharine Morrison