# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-00334-003-TJK** |
| **KATHARINE HALLOCK MORRISON aka KATE,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Katherine Hallock Morrison aka "Kate" to 18 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment for each count of conviction.

## I.      INTRODUCTION

The defendant, Katharine Hallock Morrison, a thirty-eight-year-old farmer, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ 2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol

Morrison, a commercial farmer, (1) breached the U.S. Capitol through the Senate Wing Door after witnessing the police fight to keep rioters out of the building; (2) entered sensitive areas of the Capitol building, including the Speaker of the House's Suite and the Senate Chamber; (3) rifled through desks and took pictures of their documents;   (4) remained in the Capitol for almost an hour while the Certification was halted; (5) lied to FBI agents when they attempted to interview her about her conduct on January 6; and (6) only expressed remorse for her conduct after she was arrested.

The government recommends that the Court sentence Morrison to 18 months' incarceration, which is at the middle of the advisory Guidelines' range of 15-21 months, which the government submits is the correct Guidelines calculation. An 18-month sentence reflects the gravity of Morrison's conduct, but also reflects the remorse she expressed when she was arrested by the FBI.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

In order to avoid unnecessary exposition, a brief summary of the January 6, 2021 attack on the United States Capitol Building by hundreds of rioters, Morrison among them, is set forth in the Statement of Offense for this case, ECF 75 at ¶ ¶ 1to 7.

### B.    Defendant's Role in the January 6, 2021 Attack on the Capitol

#### *The Approach to the Capitol Building*

On January 6, 2021, Morrison, and codefendants Tara Aileen Stottlemyer (Stottlemyer) and Dale Jeremiah Shalvey (Shalvey) drove to Washington, D.C. to protest Congress' certification

---

Police.

of the Electoral College vote. Morrison also told Shalvey and Stottlemyer that she wanted to go to D.C. and hear former President Donald Trump speak. *See* Statement of Offense, ECF 75, ¶ 8. Morrison, Shalvey, and Stottlemyer attended the Women for Trump rally and then marched with other protestors to the Capitol. *Id*.

Morrison, Shalvey, and Stottlemyer went to the West Front of the Capitol near the Inauguration stage. Police officers there attempted to prevent rioters from accessing the Capitol Building but were met with violence by the rioters.   Morrison used her phone to record the activity on the West Front, including Image 1 below, which shows the police equipped with impact weapons to repel rioters. Morrison also captured Shalvey in a video recording, a still shot of which is Image 2 below showing a bearded Shalvey wearing a brown cap and green coat.

**Image 1**          **Image 2**



***Images 1 and 2 are stills of photos taken by Morrison of the police attempting to repel
rioters on the West Front of the Capitol, with Shalvey circled in yellow.***

Another photo from open sources captured Morrison and Shalvey on the West Front while
the police tried to prevent rioters from entering the Capitol building.

**Image 3**



*In Image 3, Morrison and Shalvey (in the brown hat) are shown in the blue square on the West Front of the Capitol observing rioters fighting the police. This image is located at https://www.gettyimages.com/detail/news-photo/trump-supporters-clash-with-police-and-security-forces-as-news-photo/1230454354.*

***Breach of the Capitol Building and Morrison's Entry into the Capitol***

At approximately 2:13 p.m., rioters made the first breach of the Capitol Building at the Senate Wing as depicted below in Image 4, which is a still shot from United States Capitol Police closed circuit television recordings (CCTV).

**Image 4**



***Image 4 is a still of CCTV, which captures rioters breaching the Capitol Building at approximately 2:13 p.m. at the Senate Wing***

At approximately 2:22 PM, approximately nine minutes after the Capitol Building was breached, Morrison, Shalvey, and Stottlemyer entered through the Senate Wing door. All three wore helmets. *See* Exhibit 1, CCTV of Senate Wing door at approximately 2:22 p.m. The following is a still image from Exhibit 1.

**Image 5**



***Still from Exhibit 1, with Morrison circled in blue, Shalvey circled in yellow, and Stottlemyer circled in red when they breached the Capitol Building through the Senate Wing door at 2:22 p.m.***

Shortly thereafter, members of the Senate and the House of Representatives were forced to evacuate. ECF 75, ¶ 7 After entering the building, Morrison, Shalvey, and Stottlemyer advanced to the Crypt, entering it at approximately 2:24 p.m. while other rioters packed that area as shown below in a still shot from Exhibit 2.

**Image 6**



***Image 6 is a still from Exhibit 2 of Morrison, Shalvey, and Stottlemyer entering the Crypt, with all three defendants circle in red.***

At approximately 2:25 p.m., the rioters overran the police line in the Crypt. Morrison, Shalvey, and Stottlemyer joined that crowd and pushed further into the Capitol building.  *See*

Exhibit 3, which is CCTV of the rioters overrunning the police line in the Crypt.

**Image 7**



*Image 3 is a still from Exhibit 3 of rioters overrunning the police in the Crypt with the defendants circled in red.*

Morrison, Shalvey, and Stottlemyer advanced from the Crypt through the Memorial door

to a hallway leading into the Rotunda. *See* Exhibit 4, which is CCTV of a hallway leading to the Rotunda.

**Image 8**



***Image 8 is a still of Exhibit 4 depicting defendants proceeding to the Rotunda.***

Morrison, Shalvey, and Stottlemyer then entered the Speaker of the House's suite and left the suite within approximately 27 seconds. *See* Exhibit 5.

**Image 9**



***Image 9 is a still of Exhibit 5 depicting Morrison circled in blue and Stottlemyer circled in red seconds before they enter the Speaker of the House's Suite to their left.***

The defendants then went to the Rotunda. The defendants were in the Rotunda from approximately 2:33 to 2:39 p.m. While there, they joined with other rioters who were celebrating. They also gathered in what appeared to be a prayer circle. *See* Exhibit 6, which is CCTV of rioters in the Rotunda.

**Image 10**



*Image 10 is a still from Exhibit 6, depicting Morrison, Shalvey, and Stottlemyer circle in red in the Rotunda huddled with other rioters.*

The trio then went to the Senate Chamber Press Gallery and back to the second floor where they were confronted by a locked Senate door. Morrison clearly knew her whereabouts as she photographed the Senate door with her phone as shown in Image 11. At the same time, Shalvey searched through the desk outside of the door while Stottlemyer watched Shalvey. *See* Exhibit 7.

**Image 11**



*Image 11 is a still of a photograph Morrison took of a Senate door.*

**Image 12**



*Image 12 is a still of Exhibit 7, depicting Morrison (in the blue circle), Shalvey (in a yellow circle), and Stottlemyer (in a red circle) in the Senate Chamber Press Gallery.*

The trio's advance into the Capitol building continued. A very limited number of rioters breached the Senate Chamber where the Certification was scheduled. Morrison, Shalvey, and Stottlemyer were in that group. They entered the Senate Chamber at approximately 2:49 p.m. and were some of the first rioters to advance that far in the Capitol building. Once inside, Morrison, Shalvey, and Stottlemyer rifled through Senators' desks, and took pictures of documents on, and in, their desks. *See* Exhibit 8, which is a recording from the Senate Chamber surveillance camera. Still shots from Exhibit 8 are below in Images 13 – 17, with Morrison circled in blue, Shalvey in yellow, and Stottlemyer in red.

14

**Image 13**



***Image 13 is as still from Exhibit 8 showing the defendants enter the Senate Chamber with Morrison (circled in blue), Shalvey (circled in yellow), and Stottlemyer (circled in red).***

**Image 14**



*Image 14 is as still from Exhibit 8 showing the defendants in the Senate Chamber with Morrison (circled in blue) and Shalvey (circled in yellow) examining documents and Stottlemyer (circled in red) walking.*

**Image 15**



*Image 15 is as still from Exhibit 8 showing the defendants in the Senate Chamber with Morrison (circled in blue) examining an open desk, Shalvey using his phone (circled in yellow), and Stottlemyer examining documents (circled in red).*

**Image 16**



*Image 16 is as still from Exhibit 8 showing Morrison (circled in blue) photographing documents in the Senate Chamber.*

**Image 17**



*Image 17 is as still from Exhibit 8 showing Shalvey (circled in yellow), and Stottlemyer (circled in red) photographing documents in the Senate Chamber.*

Morrison used her phone to record CSPAN's television broadcast; it showed that the Senate was in recess as the rioters occupied the Capitol, thus delaying the Certification. Images 18 – 22 below also depict stills of the documents in the Senate that she recorded, including a letter from Senator Romney to Vice-President Pence, a map of the Capitol, a note to the president of the Senate – Vice President Pence, and the CSPAN broadcast. *See* Exhibits 9 – 13.

**Image 18**



*Image 18 is a still from Exhibit 9, which is a recording that Morrison made capturing rioters on the Senate Floor.*

**Image 19**



*Image 10 is a still from Exhibit 10, which is a recording that Morrison made of a letter from Senator Romney to Vice-President Pence.*

**Image 20**



*Image 20 is a still from Exhibit 11, which is a recording Morrison made of a map of the Capitol.*

**Image 21**



*Image 21 is a still from Exhibit 12, which is a recording Morrison made of a note to the president of the Senate – Vice President Pence.*

**Image 22**



*Image 22 is a still from Exhibit 13, which is a recording Morrison made of CSPAN's television broadcast showing that the Senate was in recess as the rioters occupied the Capitol.*

The trio also gathered with other rioters in the Senate Chamber and searched for, reviewed, and discussed documents that they thought pertained to the pending Certification. *See* Exhibit 14. In the video, Morrison instructed Shalvey to, "take a picture of that" as Shalvey held a document in his hand. Shalvey then told his fellow rioters to "look" at another document he found, and Stottlemyer stated it was "Ted Cruz's objection to the Arizona [inaudible]." These defendants clearly were working together in the Senate Chamber to find Certification related material.

**Image 23**



*Image 23 is a still from Exhibit 14, depicting Shalvey (circled in yellow) holding a document, which Morrison (circled in blue) instructed Shalvey to photograph.*

**Image 24**



***Image 24 is as still from Exhibit 14 depicting Stottlemyer (circled in red) state* "Ted Cruz's objection to the Arizona [inaudible]" *while Shalvey (circled in yellow) held up a document in the Senate Chamber.***

       Morrison, Shalvey, and Stottlemyer exited the Senate Chamber at approximately 2:59 p.m. They finally left the Capitol building through the Senate Carriage door at approximately 3:05 p.m., having spent approximately 43 minutes in the Capitol building.    Yet the trio lingered on Capitol grounds for almost another hour and did not leave until 3:57 p.m. as shown below in Image 25.

**Image 25**



*Image 25 is a still of CCTV, which captures Morrison, Shalvey, and Stottlemyer leaving Capitol grounds at approximately 3:57 p.m.*

On February 10, 2021, the FBI attempted to interviewed Morrison briefly after arresting her on the charges listed below. Instead of confessing her crimes, Morrison asked the agents what information led to her arrest. The FBI explained that Morrison was on video at the Capitol. When asked about violence that occurred at the Capitol, Morrison claimed that the only violence she saw against officers was what she watched on television, failing to admit that she witnessed rioters fighting the police on the West Front. She refused to comment more on her activity at the Capitol. She commented that she was worried how her actions would affect her children and husband.

### III.    THE CHARGES AND PLEA AGREEMENT

On February 2, 2022, a federal grand jury returned a superseding indictment charging Morrison with Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2),

Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). On October 3, 2022, Morrison pled guilty to Count Three, Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2).

## IV.    STATUTORY PENALTIES

The defendant now faces sentencing on Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2).

As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Three, Obstruction of an Official Proceeding.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

That Guidelines analysis, as stipulated by the parties in their plea agreement, is as follows:

Count Three: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference | +3 |
| | **Total** | 17 |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **14** |

*See* Plea Agreement ¶¶ 5(A) and Presentence Investigation Report (PSR) ¶¶ 6, 27 -37.[2]

The U.S. Probation Office calculated Morrison's criminal history as category I, which is not disputed. PSR ¶ 40. Accordingly, based on the parties' stipulated calculation of Morrison's total adjusted offense level, after acceptance of responsibility, at 14, Morrison's Guidelines imprisonment range is 15 to 21 months' imprisonment.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

---

[2] Based on the facts and circumstances of Morrison's case, the government does not seek imposition of an upward departure pursuant to U.S.S.G. § 3A1.4 n.4 (*see* Plea Agreement at ¶5(C)) because a sentence within the Guidelines range of 15-21 months is sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

A.      **Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual

defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

The nature and circumstances of Morrison's crimes weigh heavily towards a significant term of incarceration. Morrison saw the police outside the Capitol attempting to stop rioters from entering the Capitol. She recorded videos of them positioned on the West Front. Completely undeterred by the police repelling rioters and the fighting that she must have witnessed on the West Front, Morrison, and her co-defendants breached the Capitol building through the Senate Wing doors only nine minutes after it was first breached by rioters.

Morrison advanced to the Crypt, joining a crowd that overran the police there, went in the Speaker of the House of Representatives' office, and was one the few rioters who advanced into the Senate Chamber. There, Morrison, and her co-defendants, searched in Senators' desk and took photos and recordings of their documents.

The defendant's actions on January 6 show an absolute disregard for the rule of law. Her actions directly delayed the certification, and Morrison appeared to revel in doing so by recording CSPAN coverage that showed that the Certification was delayed.  Morrison's actions show a willingness to violate the law, and to engage in acts of disorder which undermined the Certification. The seriousness of this offense demands a lengthy sentence of imprisonment, but also reflects the remorse Morrison immediately expressed upon her arrest.

### B.  Morrison's History and Characteristics

The defendant is a commercial farmer. She also is married with children. PSR ¶ 50. She has no criminal history.

### C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Morrison's criminal conduct, witnessing rioters fight and overwhelm the police on the West Front, disobeying the command to leave Capitol grounds, and corruptly obstructing of an official proceeding by entering the Senate Chamber, searching for, and photographing, Senate documents, is the epitome of disrespect for the law.

### D.      The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general

---

[3] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. It was only after Morrison was arrested that she showed any remorse for her actions expressing that she was concerned how her actions would affect her husband and children. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Morrison also breached the Capitol after witnessing the police on the West Front attempting to prevent rioters from entering the Capitol. That did not deter her from entering the Capitol Building nor did the loud dispersal order which was being broadcast on the West Front. Morrison not only illegally entered the Capitol, she advanced deep into the Capitol to the Senate Chamber, and searched Senators' desk, while remaining in the Capitol for almost an hour. These actions demonstrate that this defendant's sentence must be sufficient to provide specific deterrence from committing future crimes.

### E. The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing

disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

As of the date of this sentencing memorandum, only a few Capitol Riot defendants who

reached the Senate Chamber have been sentenced for a violation of *only* 18 U.S.C. § 1512(c)(2). In *United States v. Christine Priola*, 22-cr-242-TSC, the defendant joined the front lines of the riot and entered the Capitol building soon after other rioters overcame the U.S. Capitol Police officers guarding the East Rotunda (Columbus) doors. She carried a large sign reading, "WE THE PEOPLE TAKE BACK OUR COUNTRY" on one side and "THE CHILDREN CRY OUT FOR JUSTICE" on the other side. Once in the building, Priola made her way to the Senate floor. While there, she spoke to an associate by telephone and encouraged that person to come inside either the Capitol building or the Senate Chamber, saying it was "now or never." Like Morrison, Priola's Guidelines range was 15 to 21 months. Judge Chutkan sentenced Priola to 15 months' incarceration and 12 months' supervised release.

In *United States v. Paul Hodgkins*, 21-cr-118-RDM, Hodgkins unlawfully entered the U.S. Capitol about 50 minutes after it was first breached and made it to the Senate Floor with a Trump flag. Hodgkins pled guilty in June 2021 and was the first defendant to be sentenced for a violation of Section 1512(c)(2), having taken very early responsibility for his actions. He neither committed nor incited violence on January 6. Unlike Morrison, Hodgkins did not rifle through Senators' desk while in the Senate Chamber or photograph their material. Hodgkins also contributed more than 100 hours of community service since January 2021; the Government is unaware of any such service by this defendant. The United States requested 18 months' imprisonment, and Judge Moss imposed a sentenced of 8 months' imprisonment. Morrison's actions warrant a significantly greater sentence than Hodgkins because of her activity in the Senate Chamber. Unlike Hodgkins, Morrison is not one of the first Capitol Siege defendants to plead guilty.

The comparison of Morrison's actions to those of Priola and Hodgkins confirms that a

sentence of 18 months' imprisonment in this case would not constitute an unwarranted sentencing disparity.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[4] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Morrison must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Morrison played in the riot on January 6.[5] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,734,783.14" in damages, a figure based on

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Morrison's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 92.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 18 months, which is a mid-range sentence as calculated by the government and as agreed upon by the parties in the plea agreement, restitution of $2,000, a fine, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:      /s/ Anthony L. Franks
         ANTHONY L. FRANKS
         Assistant United States Attorney
         Bar No. 50217MO
         555 Fourth Street, N.W., Room
         Washington, DC   20530
         anthony.franks@usdoj.gov
         (314) 539-3995